## AFFIDAVIT

I, Alexa Montesano, (hereafter referred to as affiant) being duly sworn depose and state:

## INTRODUCTION

I am a Special Agent of the Drug Enforcement Administration (DEA) assigned to the Detroit Field Division, Columbus District Office. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516. Your affiant has been employed by the DEA since March, 2021. Your affiant is empowered to investigate, to make arrests with or without warrants and to execute search warrants under the authority of 21 U.S.C. § 878.

Prior to being employed by the DEA your affiant was employed by the Ohio Department of Public Safety's, Ohio Investigative Unit from August, 2019 until March, 2021. During this time, your affiant has accumulated the following training and experience:

(a) I graduated from the DEA Academy located at the FBI Academy, Quantico, Virginia. I received approximately 16 weeks of specialized narcotics related training. The training included controlled substances identification, narcotics related investigative techniques, interview and interrogation training, preparation of search warrants, tactical application of narcotics enforcement, surveillance and electronic monitoring techniques and money laundering investigations.

(b) During the course of my law enforcement career I have had experience in debriefing defendants and interviewing participating witnesses, cooperating individuals and other persons who have personal knowledge and experience regarding the amassing, spending, conversion, transportation, distribution, and concealment of records and proceeds of trafficking in controlled substances.

(c) As a DEA agent and Ohio Investigative Unit agent, I have participated in the execution of numerous search warrants at residences of narcotics traffickers and have participated in numerous arrests for drug related offenses. I have drafted numerous search warrants.

(e) During the course of my law enforcement career, I have completed the following training; Ohio State Highway Patrol Training Academy (January 2020), Interview and Interrogation (2020) and Operation Jetway Training (2022).

The information set forth in this affidavit comes from your affiant's personal involvement in this investigation, as well as information provided to your affiant by other law enforcement officers. This affidavit is intended to show only that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this investigation.

set

## PURPOSE OF AFFIDAVIT

1.     This affidavit is made in support of an application for a federal arrest warrant and complaint against members of the Tanya BAIRD Drug Trafficking Organization (DTO) namely: James H. JOHNSON (hereinafter "JOHNSON"), Joseph GORMAN (hereinafter "GORMAN"), Karen FELTS (hereinafter "FELTS"), Jeremy CORWIN (hereinafter "CORWIN"), Karianna VALDEZ (hereinafter "VALDEZ"), Kevin Miles TROUTMAN, a.k.a. Miles H. Westbrook, (hereinafter "TROUTMAN"), Jack Ray PRESSLEY (hereinafter "PRESSLEY"), Mario BLANCH (hereinafter "BLANCH"), Michelle LLOYD (hereinafter "LLOYD"), Laura BAKER (hereinafter "BAKER"), Brian DOLIBOA (hereinafter "DOLIBOA"), Mickey HASKELL (hereinafter "HASKELL"), and Brett MADDOX  (hereinafter "MADDOX"). My knowledge of this investigation is based upon my own personal observations, as well as the observations and investigations conducted by other law enforcement officers and investigators concerning the facts and circumstances involved in the subject investigation. I have not included in this Affidavit all the facts known to me, but only that information sufficient to establish probable cause to believe that JOHNSON, GORMAN, FELTS, CORWIN, VALDEZ, TROUTMAN, PRESSLEY, BLANCH, LLOYD, BAKER, DOLIBOA, HASKELL, and MADDOX have committed a violation of Title 21, United States Code, Section 846, conspiracy to distribute and possess with the intent to distribute a Schedule I controlled substance.

## PROBABLE CAUSE

1.     Since December; 2020, investigators with the Federal Bureau of Investigation and the Drug Enforcement Administration began an investigation into the BAIRD DTO and the Aryan Brotherhood (AB), a Neo-Nazi gang operating inside of Department of Rehabilitation and Corrections (DRC) facilities. During the investigation, investigators identified BAIRD, who is a citizen of South Africa, as a facilitator, possessor, and distributor of large amounts of synthetic cannabinoids (K2), via mail, into the United States, specifically the Southern District of Ohio. K2, a synthetic variant of marijuana with synthetic psychoactive chemicals, is listed as a Schedule I substance under the Controlled Substances Act. Investigators have identified JOHNSON, GORMAN, FELTS, CORWIN, VALDEZ, TROUTMAN, PRESSLEY, BLANCH, LLOYD, BAKER, DOLIBOA, HASKELL, and MADDOX as K2 co-conspirators for BAIRD and retail distributors in, or around, the, Columbus, Ohio area and throughout the United States. Your affiant, or other investigators assigned to this case, have interviewed several confidential sources (hereinafter "CS-1", "CS-2", and "CS-3") regarding the BAIRD DTO. The information provided by CS-1, CS-2, and CS-3, has been corroborated by your affiant, other investigators assigned to this case, Global Tel Link (GTL) recorded calls, text message records, email records, payment records, DRC visitation records, DHL importation records, administrative and grand jury subpoenas, JPay (inmate messaging system), search warrants, and various other sources.

2.     On or about December 2, 2020, investigators applied for and obtained a federal search warrant by the Southern District of Ohio United States Magistrate Judge Chelsea M. Vascura for the residence of and property, to include electronic devices, belonging to TROUTMAN. On December 3, 2020, investigators executed a federal search warrant at 5587 Tamarack Boulevard, Columbus, Ohio, which is the registered address of TROUTMAN, who is a known associate of the AB. During the search warrant, investigators located and seized a DHL

package addressed to PRESSLEY with a return address and sender as BAIRD at 62 La Digue, RandPark Ridge, South Africa, which is the registered address of BAIRD. The package contained approximately 80 sheets of legal documents saturated with K2 which subsequently was tested by the FBI Laboratory, which resulted in a positive test for K2. Also located inside of the DHL package was 300 sheets of suspected Suboxone. During the search warrant, investigators located and seized a cellular device belonging to TROUTMAN. After extracting information from TROUTMAN's cellular device, investigators obtained a text message string between PRESSLEY and TROUTMAN where PRESSLEY initiates a meeting location between the two and tells TROUTMAN that he has "300 strips and 80 sheets"; that message was consistent with what was located inside of the DHL package seized from TROUTMAN's residence, which tested positive for K2. Through a grand jury subpoena, investigators obtained records from TROUTMAN's CashApp account where in or about June; 2019, TROUTMAN sent $2,375 in suspected drug proceeds to BAIRD. Based on investigators' training and experience and knowledge of the case, packages seized, and grand jury subpoenas, investigators identified TROUTMAN's role in the BAIRD DTO as a co-conspirator.

3.      In or about May; 2021, investigators from the Ohio State Penitentiary (OSP) listened to recorded GTL telephone conversations between GORMAN, an OSP inmate and known AB member, and FELTS, who at that time was believed to be GORMAN's significant other. Upon reviewing the recorded GTL telephone conversation, based on investigators training and experience, investigators from OSP believed that GORMAN and FELTS were engaged in conversation in regards to conveyance of illegal substance into the OSP facility. Based upon the recorded GTL telephone conversation, investigators from OSP recorded the in person visit between GORMAN and FELTS. During the recorded visit, GORMAN and FELTS speak about the "paper" stating that it looks "obvious", and GORMAN asked FELTS about BAIRD in regards to what connection can be proven between him and BAIRD. Also during the recorded visit, GORMAN directs FELTS to give the "paper" to an attorney, pay the attorney, and have the attorney's office send in the "paper" to the OSP facility on GORMAN's behalf. Around the same time, investigators seized a package at the OSP facility from an attorney's office addressed to GORMAN. Subsequently, the package was seized and sent to the Ohio State Highway Patrol Laboratory, which resulted in a positive test for K2. Investigators were able to identify that approximately three weeks prior to the recorded in person visit between FELTS and GORMAN, based upon the importation records that were later obtained, FELTS was a recipient of a DHL package from BAIRD and/or 62 La Digue. Per the importation records, FELTS has received approximately two packages from BAIRD and/or 62 La Digue. Investigators identified that in approximately 2017 and/or 2018, GORMAN was incarcerated in the same cell block at an Ohio DRC facility as JOHNSON. Based on investigators' training and experience, information provided by CS-2 and CS-3, and the importation records, investigators identified GORMAN's and FELTS' roles in the BAIRD DTO as co-conspirators.

4. In or about June; 2021, investigators requested DHL importation records from the United States Customs and Border Protection (CBP). The importation records list packages that were sent from BAIRD and/or 62 La Digue, the approximate weight of each package, the port in which the DHL package came into the United States, and the listed recipient and address of each package.

5. During the same month, investigators conducted an interview with CS-1, who investigators identified as being a recipient of multiple DHL packages from BAIRD and/or 62 La Digue and who was previously convicted of a federal offense. CS-1 advised investigators that; in approximately 2017, he/she instructed BAIRD on how to saturate paper with K2 and send the saturated papers into the prison where CS-1 was incarcerated. CS-1 indicated to investigators that he/she told BAIRD to purchase K2 powder online from China and have it shipped to South Africa. CS-1 indicated to investigators that he/she received approximately eight packages, each package containing 30 pieces of paper saturated with K2, from BAIRD while incarcerated which was consistent with the importation records that were later obtained. CS-1 stated that he/she knew that BAIRD had a significant other that was incarcerated who CS-1 identified as "James", who investigators know as JOHNSON.

6. During the same month, investigators from CBP seized a package containing papers saturated with K2, addressed to BAKER at her registered address, 620 Magnolia Road, Tiptonville, Tennessee, with a return address and sender as BAIRD at 62 La Digue. Subsequently, the general papers were tested by CBP's laboratory which resulted in a positive test for K2. CS-3 stated that BAKER was a recipient of a DHL package containing papers saturated in K2 on behalf of MADDOX who is currently incarcerated in Memphis, Tennessee. Per the importation records, MADDOX was a direct recipient of approximately two DHL packages and BAKER was a recipient of approximately one DHL package (which investigators seized and CS-3 stated was on behalf of MADDOX) from BAIRD and/or 62 La Digue. Based on investigators' training and experience, information provided by CS-3, the importation records, and the package seized, investigators identified MADDOX's and BAKER's roles in the BAIRD DTO as co-conspirators.

7. In or about October; 2021, investigators spoke with CS-2, who investigators identified as being a recipient of multiple DHL packages from BAIRD and/or 62 La Digue and who investigators learned was a previous target of investigation at an Ohio DRC facility for conveyance of illegal substances into the facility. CS-2 advised investigators that; he/she would receive the packages on behalf of GORMAN, at the direction of JOHNSON, in the mail from BAIRD containing legal documents that were saturated in K2. CS-2 advised that the legal documents would be pre-addressed and that CS-2's responsibility was placing stamps on the legal documents and sending the legal documents saturated with K2 into the Ohio DRC facilities for GORMAN. CS-2 stated that BAIRD and JOHNSON came up with the idea to saturate greeting cards in K2. CS-2 stated that when he/she would receive the greeting cards saturated in K2, CS-2 would address the greeting cards to different inmates at the direction of GORMAN.

CS-2 stated that once he/she collected the drug proceeds for the papers saturated with K2, he/she would send the drug proceeds to BAIRD, via CashApp or PayPal which was provided to investigators. CS-2 stated that JOHNSON, who is a known AB member, essentially directed BAIRD on which inmates she could or could not send papers saturated in K2 to. Investigators corroborated the information provided by CS-2 by cross referencing he importation records provided by CBP which showed that CS-2 received approximately four packages from BAIRD and/or 62 La Digue.

8.      In or about March; 2022, investigators requested updated importation records from CBP. To date, the importation records show approximately 93 packages being sent into the United States from BAIRD and/or 62 La Digue dating back to October; 2018. Investigators learned that some of the packages were sent with a listed sender of BAIRD reflecting a different return address and some of the packages were sent with the return address of 62 La Digue reflecting a different sender's name.

9.      On or about March 22, 2022, investigators applied for and obtained a federal complaint and arrest warrant for BAIRD by the Southern District of Ohio United States Magistrate Judge Chelsey M. Vascura. On March 23, 2022, investigators arrested BAIRD at the John Glenn Columbus International Airport.

10.      In the same month, investigators conducted an interview with CS-3. CS-3 advised investigators that; JOHNSON would direct inmates to contact him/her about receiving papers saturated in K2. CS-3 stated that the inmates would contact him/her and advised him/her on who to send the DHL packages containing papers saturated in K2 to on the inmates' behalf, which investigators have corroborated through DRC visitation records, JPay and the importation records. CS-3 stated that he/she would collect the drug proceeds on behalf on the inmates, who were recipients of paper saturated in K2, via PayPal, CashApp, Western Union and various other money sources by various individuals, which investigators have been able to corroborate through grand jury and administrative subpoenas and documents provided by CS-2. CS-3 stated that he/she has sent papers saturated in K2 and/or the DHL packages on half of the inmates receiving the papers saturated in K2 to: JOHNSON (AB member and inmate), PRESSLEY on behalf of DOLIBOA (AB member and inmate), VALDEZ on behalf of CORWIN (inmate), CS-2 on behalf of GORMAN (AB member and inmate), BLANCH, HASKELL (inmate), and BAKER on behalf of MADDOX (inmate), which investigators have been able to corroborate through the importation records, information provided by CS-2, JPay, recorded visitations, previous DRC investigations, and packages seized. CS-3 stated that JOHNSON would also be a recipient of papers saturated in K2 but that he/she would place the papers saturated in K2 inside of a package being sent into a facility addressed to another inmate. Based on investigators' training and experience, information provided by CS-2 and CS-3, investigators identified JOHNSON's role in the BAIRD DTO as a co-conspirator.

11.      Based upon information provided by CS-3 and the DHL package seized addressed to PRESSLEY during a search warrant at TROUTMAN's registered address, investigators cross referenced the importation records associated with PRESSLEY. PRESSLEY was a recipient of approximately five DHL packages from BAIRD and/or 62 La Digue on behalf of DOLIBOA, who is a known AB member and in approximately 2018 and/or 2019 was incarcerated in the

same cell block at an Ohio DRC facility as JOHNSON. Per the documents provided to investigators from CS-2, PRESSLEY sent CS-2 suspected drug proceeds via CashApp on behalf of "B" who investigators believe "B" is short for DOLIBOA. Investigators were able to identify that PRESSLEY is an "approved" visitor on the Ohio DRC visitation list for DOLIBOA and is listed on the visitation list as DOLIBOA's "cousin". Based on investigators' training and experience, information provided by CS-3, documents provided by CS-2, packages seized, visitation records, and the importation records, investigators identified PRESSLEY's and DOLIBOA's roles in the BAIRD DTO as co-conspirators.

12. In the same month, investigators cross referenced the importation records associated with CORWIN, who in approximately 2019 and/or 2020, was incarcerated in the same cell block at an Ohio DRC facility as JOHNSON. Per the importation records, VALDEZ received approximately six packages from BAIRD and/or 62 La Digue at CORWIN's registered address. Investigators obtained a JPay from VALDEZ to CORWIN where VALDEZ states "have your friend come get this package or I am throwing it out". Per the importation records, VALDEZ received a package approximately five days before sending the JPay message to CORWIN. Based on investigators' training and experience, investigators believe that VALDEZ received packages on CORWIN's behalf, at the direction of JOHNSON, containing papers suspected to be saturated in K2 and would facilitate giving the papers suspected to be saturated in K2 to another individual who would then be responsible for sending those papers into the facility where CORWIN was incarcerated. Based on investigators' training and experience, information provided by CS-3, text message records (which are further detailed below), and the importation records, investigators identified CORWIN's and VALDEZ's roles in the BAIRD DTO as co-conspirators.

13. In the same month, investigators applied for and had signed a federal search warrant by the United States Southern District of Ohio United States Magistrate Judge Chelsey M. Vascura for authorization to extract information from four electronic devices that were in BAIRD's possession at the time of her arrest. From the extraction, investigators obtained a string of text messages between BAIRD and CORWIN where they speak in detail about the papers saturated in K2, the type of paper that BAIRD should use, and CORWIN advises BAIRD to create a website where BAIRD would sell "fake" papers saturated in K2 in order for them to make a profit. From the extraction, investigators also discovered that BAIRD was in contact with MADDOX through various different means of communication.

14. In the same month, based upon information provided by CS-3, investigators cross referenced the importation records associated with BLANCH. Per the importation records, BLANCH was a recipient of approximately four DHL packages with a listed address of 5133 Denton Cove North, Memphis, Tennessee, 38125. Investigators obtained records from BAIRD's Western Union account, which showed that LLOYD paid BAIRD approximately $5,300 in suspected drug proceeds in 2022. Per the Western Union records, investigators were able to identify that LLOYD shares the same address, 5133 Denton Cover North, as BLANCH, which was the listed address for the DHL packages that were sent from BAIRD and/or 62 La Digue. Based on investigators' training and experience, information provided by CS-3, grand jury subpoenas, and the importation records, investigators identified LLOYD's and BLANCH's roles in the BAIRD DTO as co-conspirators.

15.    In the same month, after CS-3 stated that he/she sent papers saturated in K2 to HASKELL, investigators were put in contact with an investigator, who has since retired, from the Southern Ohio Correctional Facility. Investigators learned that in February; 2018, BAIRD and HASKELL were the targets of an investigation at the Southern Ohio Correctional Facility for conveyance of illegal substances into the facility. Investigators from the Southern Ohio Correctional Facility listened to a series of recorded GTL telephone conversations between BAIRD and HASKELL where they speak in detail of sending legal documents and books saturated in K2 into the facility for HASKELL and the profit in which they will both make. Investigators identified that in approximately 2018, HASKELL was incarcerated in the same cell at an Ohio DRC facility as JOHNSON. Based on investigators' training and experience, a previous investigation, and information provided by CS-3, investigators identified HASKELL's role in the BAIRD DTO as a co-conspirator.

16.    In summary; throughout this investigation, investigators were able to identify the following:

a)    Per information provided by CS-3 and corroborating evidence including DHL packages seized which resulted positive for K2, text messages records, payment records, DRC visitation records, information provided by CS-2, and the importation records; TROUTMAN, DOLIBOA, PRESSLEY, and CS-3 conspired to distribute at least approximately 600 gross grams of K2.

b)    Per information provided by CS-3 and corroborating evidence including information provided by CS-2, GTL telephone conversations, recorded in person visits, packages seized which resulted positive for K2, and the importation records; GORMAN, FELTS, and CS-3 conspired to distribute at least approximately 240 gross grams of K2.

c)    Per information provided by CS-3 and corroborating evidence including packages seized which resulted positive for K2, the importation records, and information gathered from a phone extraction; BAKER, MADDOX, and CS-3 conspired to distribute at least approximately 360 gross grams of K2.

d)    Per information provided by CS-3 and corroborating evidence including information provided by CS-2; JOHNSON and CS-3 conspired to distribute at least approximately 4,000 gross grams of K2.

e)    Per information provided by CS-3 and corroborating evidence including text massage records, JPay records, and the importation records; CORWIN, VALDEZ, and CS-3 conspired to distribute at least approximately 720 gross grams of K2.

f)    Per information provided by CS-3 and corroborating evidence including the importation records, and payment records; LLOYD, BLANCH, and CS-3 conspired to distribute at least approximately 480 gross grams of K2.

g) Per information provided by CS-3 and corroborating evidence including a previous Ohio DRC investigation; HASKELL and CS-3 conspired to distribute at least approximately 4,000 gross grams of K2.

## CONCLUSION

17. Throughout this investigation, a total of approximately 93 known packages were mailed from BAIRD and/or La Digue into the United States. Investigators were able to identify that multiple recipients on the importation records, who received packages from BAIRD and/or 62 La Digue, have had and currently have communication, and/or have attended visits with current Ohio DRC inmates. Investigators were also able to identify that some of the DRC inmates themselves, who have direct ties to the recipients on the importation records, have had or currently have communication with BAIRD. To date, investigators have seized approximately 1,611 gross grams of various papers, which tested positive for K2 from the BAIRD DTO. Based on investigators' training and experience, knowledge of this case, information provided by CS-1, CS-2, and CS-3, and the importation records, investigators believe that the BAIRD DTO is responsible for approximately 4,000 gross grams of K2. Per the importation records, co-conspirators FELTS, VALDEZ, BAKER, PRESSLEY, and BLANCH are all recipients of DHL packages, containing paper suspected to be saturated in K2, from BAIRD and/or 62 La Digue, which investigators were able to corroborate through information provided by CS-1, CS-2, and CS-3, and packages seized. Investigators believe that the recipients of the importation records have direct ties with Ohio DRC inmates, within the Southern District of Ohio, and other DRC inmates throughout the United States. Investigators believe that the papers saturated in K2 were shipped from BAIRD and/or 62 La Digue in South Africa with the intent to be delivered, via recipients on the importation records, into different DRC facilities throughout the United States.

18. Based upon this information, your affiant believes probable cause exists that James H. JOHNSON, Joseph GORMAN, Karen FELTS, Jeremy CORWIN, Karianna VALDEZ, Kevin Miles TROUTMAN, Jack Ray PRESSLEY, Mario BLANCH, Michelle LLOYD, Laura BAKER, Brian DOLIBOA, Mickey HASKELL, and Brett MADDOX have violated Title 21, United States Code, Sections 846 and 841 (a)(1), conspiracy to distribute and possess with the intent to distribute a Schedule I controlled substance.

Alexa Montesano
Special Agent
Drug Enforcement Administration

Subscribed and sworn before me this _____ day of May, 2022.

Elizabeth A. Preston Deavers
United States Magistrate Judge

Honorable Elizabeth Preston Deavers
United States Magistrate Judge
Southern District of Ohio

